1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

### EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| ROBERT MANUEL VARGAS,                    ) | 1:12-cv-00816-SKO |
|                ) | |
|                ) | **ORDER REGARDING PLAINTIFF'S** |
|         Plaintiff,                   ) | **SOCIAL SECURITY COMPLAINT** |
|                ) | |
|     v.                                   ) | (Doc. 1) |
|                ) | |
| CAROLYN W. COLVIN,                        ) | |
| Acting Commissioner of Social Security,   ) | |
|                ) | |
|         Defendant.                   ) | |
|                ) | |
| _____) | |

11
12
13
14
15
16
17
18
19

### BACKGROUND

20

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the

21 "Commissioner" or "Defendant") denying his applications for Disability Insurance Benefits ("DIB")

22 pursuant to Title II of the Social Security Act.  42 U.S.C. § 405(g).  The matter is currently before

23 the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable

24 Sheila K. Oberto, United States Magistrate Judge.[1]

25
26
27
28

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 7, 10.)

## FACTUAL BACKGROUND

Plaintiff was born in January 1957 and worked for DHL as a truck driver until he was injured in December 2007. (Administrative Record ("AR") 44-45.) In seeking disability benefits, Plaintiff states that he is precluded from working due to back, knee, and left-shoulder injuries, as well as diabetes. (AR 165.)

**A.     Relevant Medical Evidence**

    **1.     Medical Evidence Before the ALJ**

At the time of his December 2007 workplace injury, Plaintiff was seen at an urgent care clinic, x-rays were taken of his left knee and leg, he was given time off of work, medication was prescribed, and he was told to follow-up with a primary care physician. (AR 291.) At a follow-up examination by Kavitha Moturi, M.D., Plaintiff was instructed to increase his activity without support as tolerated, and he was advised against complete bed rest. (AR 292.) Plaintiff was prescribed Ketorolac, Ibuprofen, and Hydrocodone-Acetaminophen, and he was authorized for physical therapy twice a week for three weeks. (AR 292-93.)

On January 7, 2008, Plaintiff was examined by Dr. Moturi who sought authorization of a magnetic resonance imaging scan ("MRI") of Plaintiff's left knee to rule out internal derangement and meniscal tear. (AR 297-98.) MRI results confirmed that Plaintiff had an extensive lateral meniscus tear and a medial meniscus tear with injury to the anterior cruciate ligament ("ACL") in his left knee. (AR 309.) On February 26, 2008, Plaintiff was referred to Elizabeth Desmond, M.D., an orthopedic specialist, for a consult and treatment of Plaintiff's ACL with complex tears of both medial and lateral menisci. (AR 311.) Dr. Desmond recommended surgery with ACL and meniscal repair. (*See* AR 314.)

On May 9, 2008, Plaintiff underwent a left-knee arthroscopic ACL reconstruction and left arthroscopic medial and lateral partial meniscectomies. (AR 276-77.) Post surgery, Plaintiff was provided follow-up care on several occasions. On May 22, 2008, treatment notes indicate Plaintiff's left knee still had some swelling, but it was improved from his last visit. (AR 260.) Plaintiff

reported that the pain level was decreasing, and it was controlled with oral pain medication. (AR 260.) Dr. Desmond predicted that Plaintiff would be on temporary disability for approximately three to four months post-operatively. (AR 260.)

On July 3, 2008, Plaintiff reported to Dr. Desmond that he was slowly improving, but still had pain anteriorly and some occasional instability. (AR 256.) The doctor assessed his knee as stable post-surgery, and recommended Plaintiff continue quadriceps strengthening and rehabilitation exercises as well as physical therapy. (AR 256.) Plaintiff was to remain off full duty, but could return to desk work with restrictions of no lifting greater than 10 pounds, no squats, no standing for longer than two hours without rest, and no kneeling. (AR 256.)

On September 25, 2008, follow-up treatment notes indicate Plaintiff continued to improve with physical therapy, he was no longer using a cane for walking, and his strength was improving. (AR 250.) While Plaintiff reported being able to ambulate on flat ground without difficulty, he had difficulty with pivoting motions and walking on uneven ground. (AR 250.) He also reported new complaints of low back pain which emanated from his lower back to the back of his right knee with some associated decreased sensation in his buttocks. (AR 250.) Dr. Desmond recommended that Plaintiff continue with physical therapy for another six weeks as well as undergo evaluation by a spine specialist for further assessment of his lower back. (AR 250.)

On October 30, 2008, at a follow-up examination, Plaintiff reported that his pain, mobility, and strength had improved, but they had not returned to pre-injury levels. (AR 248.) Plaintiff continued to complain of lower back pain with radicular symptoms down to his right knee. (AR 248.) Objectively, Dr. Desmond reported that Plaintiff's gait was smooth, he walked with a slight 10-degree external rotation of his foot, and his left knee motion was 0 to 130 with no effusion. (AR 248.) Dr. Desmond noted that Plaintiff's improvement was reaching a plateau, and he would probably not be able to return to work without restrictions. (AR 248.) She opined that post-traumatic arthritis was most likely in Plaintiff's future, and when it became symptomatic, he would likely need a total knee replacement. (AR 248.)

On examination on December 11, 2008, Plaintiff reported that his lower back was causing him "major major problems." (AR 244.) While he had started physical therapy on his lower back,

and it had been improving his symptoms, he had no remaining authorized visits. (AR 244.) Plaintiff indicated that he was in pain all the time which extended from his central lower lumbar spine to his right buttock and down to the back of his knee. (AR 244.) The pain was worse with prolonged activity and extension and better with rest and physical therapy. (AR 244.) Dr. Desmond noted that Plaintiff's gait was smooth, but he was walking with approximately 10 degrees of external rotation of his foot. (AR 244.)

On March 5, 2009, x-rays indicated that Plaintiff had old degenerative changes to the medial and lateral aspects of his left knee, slight spurring of the patella, and surgical defects consistent with prior cruciate ligament surgery. (AR 235.) In Plaintiff's right knee, minimal degenerative changes were noted. (AR 235.)

On April 20, 2009, Plaintiff was examined by John D. Warbritton, III, M.D., for purposes of an Agreed Medical Re-examination ("AME"), ostensibly part of Plaintiff's workers compensation claim. (AR 451-72.) During examination, Plaintiff was noted to ambulate with a wide-based and grossly antalgic gait, favoring the left lower extremity with a list toward the right side. (AR 465.) Palpation of Plaintiff's lower back revealed slight tenderness about the lumbosacral junction in the midline. (AR 465.) Examination of the sacroiliac joints revealed no tenderness on the right, moderate tenderness on the left, and no evidence of tenderness about the sciatic notches bilaterally. (AR 465.) A supine straight leg raising test was positive on the left at 60 degrees; a crossed straight leg raising test was negative on the right side; a sitting straight leg raising test was positive and confirmatory on the left; a straight leg raising test and a bowstring test were negative. (AR 465.) Because Plaintiff complained of radiating lower back pain and numbness, electrodiagnostic studies (also referred to as EMG testing) were performed showing abnormal results of a chronic left L5 and S1 radiculopathies with mild ongoing denervation. (AR 466, 512.)

Dr. Warbritton determined that Plaintiff's left knee exhibited evidence of significant atrophy and substantial compromise, and he opined that Plaintiff experienced a 50 percent loss of function. (AR 470.) He recommended Plaintiff participate in a strengthening and stretching exercise program with a judicious use of medications including anti-inflammatory agents, muscle relaxants, and narcotic analgesics. (AR 471.) Dr. Warbritton noted that Plaintiff exhibited "significant residual

laxity" in his left knee, but "rather than attempting further reconstructive surgery," he recommended that Plaintiff wear a custom-made degrotation brace. (AR 472.) With regard to Plaintiff's back, Dr. Warbritton indicated that Plaintiff should undergo one or two lumbar epidural steroid and anesthetic injections a year, but he cautioned against spinal surgery. Using the DRE (diagnosis related estimates) method, Dr. Warbritton opined that Plaintiff experienced an impairment of his lumbar spine in the maximal range of thirteen percent of the whole person. (AR 467.)

On July 11, 2009, Plaintiff was examined by consultative state agency physician Theodore Georgis, Jr., M.D. (AR 339-44.) Dr. Georgis observed that Plaintiff walked unassisted from the waiting room and sat comfortably, he was well groomed, cooperative, and a "fairly good historian." (AR 341.) Plaintiff was able to don and doff his shoes and get on and off the examination table with ease. (AR 341.) Straight leg raising tests were negative in the sitting and supine positions. (AR 342.) Plaintiff's left shoulder showed mild diffuse tenderness, without deformity, instability, impingement sign, or rotator cuff weakness; Plaintiff's back was straight with no deformity or instability or spasm, but it was mildly tender; and Plaintiff's left knee showed healed portals as well as an anterior medial scar over the proximal tibia without inflammation. (AR 343.) There was mild swelling in the knee, but no effusion. (AR 343.) The knee showed instability, but no deformity. There was mild tenderness over the lateral aspect of the knee.

Dr. Georgis diagnosed Plaintiff with chronic low back pain, straining injury, possible disc bulge by history with no radiculopathy; left-knee pain, status post-ACL reconstruction with meniscectomy, medially and laterally; and left shoulder pain, probable bursitis. (AR 343.) Dr. Georgis opined that Plaintiff could stand and walk up to six hours; sit without limitation; lift and carry 20 pounds occasionally and 10 pounds frequently; perform only occasional climbing, balancing, stooping, kneeling, crouching, and crawling as a result of his left knee reconstruction and meniscectomy, as well as his lower back pain; and only "frequently," as opposed to "constantly," perform reaching with his left shoulder due to his bursitis. (AR 344.)

July 16, 2009, x-rays of Plaintiff's left shoulder "demonstrate[d] anatomic alignment of the glenohumeral and acromioclavicular joints. The underlying ribs and pulmonary apex [were] intact. Osseous and soft tissue structures unremarkable." (AR 345.) The radiologist gave an impression

of "[n]egative left shoulder." (AR 345.) A radiologist also interpreted lumbar spine x-rays, finding that Plaintiff had lumbar spondylosis, mild disc degeneration at L4-L5, and facet arthropathy with no acute process. (AR 346.)

On May 12, 2010, Plaintiff underwent an Agreed Medical Examination for psychiatric evaluation with Tara Z. May, Ph.D. (AR 492-95.) Dr. May reported that the examination testing suggested

> a mixed picture of anxiety, depression, and chronic somatic complaints. The individual is clearly unhappy with his current circumstances and may feel that others do not understand his pain. Such men tend to harbor feelings of insecurity, inadequacy, and emotional inhibition. He is likely to have a propensity towards somatization. Although actual physical problems may exist, the individual is likely to report symptoms that exceed organic findings. His physical symptoms may be used to focus tension, express anger or other emotional conflicts. Interpersonally, he is likely to seem dependent and needy. He is likely to get along with others and deny any unusual social anxiety. He may complain of disruptions in attention and concentration. He tends to ruminate over his current difficulties.

(AR 494.)

On June 10, 2010, Andrew D. Whyman, M.D., considered Plaintiff's mental impairments. He opined as follows:

> [Plaintiff] developed a reactive psychiatric syndrome, a depressive disorder, as a consequence of orthopedic injuries and what amounted to career-ended orthopedic injuries after long-term employment. The predominant cause of his emotional difficulties arises as a consequence of his orthopedic injuries.
>
> . . .
>
> He has a GAF of 55,[2] or a Whole Person Impairment rating of 23. He does have significant sleep disturbance, significant fluctuat[ions] in appetite and weight, and significant anxious and depressive symptoms. There is some accompanying difficulty in social as well as occupational functioning . . . . The claimant also carries [] diagnoses of diabetes and hypertension. On the other hand, none of these matters have caused any significant pathology or psychiatric symptomatology . . . .
>
> Using the AMA guide and their impairment[-]due[-]to[-]mental[-]and[-]behavioral [-]disorders table, the claimant shows mild impairment in activities of daily living, mild to moderate impairment in social functioning, mild to moderate impairment in concentration, and mild to moderate impairment in adaption.

---

[2] A GAF score represents a Global Assessment of Functioning score that considers an individual's overall level of psychological, social, and occupational functioning. American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed. 2000). A score of 55 indicates moderate difficulty in social, occupational, or school functioning. *Id.*

. . .

From a strictly psychiatric perspective, he is not a Qualified Injured Worker. He is capable of doing the work he did before from that perspective alone.

(AR 490-91.)

On March 28, 2011, Plaintiff was examined by Justin Lo, M.D. (AR 502-04.) Dr. Lo noted that although Plaintiff walked to the examination room, he did so with a limp. (AR 503.) Plaintiff's lumbar spine showed decreased range of motion secondary to pain present with both flexion and extension, and Plaintiff had mild tenderness to palpation throughout his lumbar spine. (AR 503.) His straight leg raising test was negative bilaterally, but he had a positive Patrick's test bilaterally.[3] Plaintiff had numbness and tingling to light touch along the left anterolateral leg, and had 4/5 motor strength of the left hip flexion and left knee flexion. (AR 503.) Dr. Lo found that Plaintiff "clearly has low back pain with radiation to his lower extremities associated with numbness, tingling, and weakness of his lower extremities indicating a diagnosis of lumbar radiculopathy." (AR 503.) Dr. Lo noted that these findings were confirmed by the April 2009 EMG testing ordered by Dr. Warbritton. (AR 503.) Dr. Lo authorized a lumbar MRI, and pending review of the MRI, anticipated considering Plaintiff for interventional injections, lumbar medial branch block with rhizotomy, and epidural steroid injections. (AR 504.)

On April 6, 2011, an MRI of Plaintiff's lumbar spine was obtained. (AR 499.) The radiologist provided the following impression:

1. L5-S1 disc degeneration and mild facet arthropathy. There may be a broad based posterior protrusion, approaching, but not distinctly impinging upon the S1 nerve roots. Overall, there is mild canal stenosis. Moderate to severe right and mild left neural foraminal narrowing are demonstrated.

2. L4-5 disc degeneration and moderate facet arthropathy with annular bulging and hypertropic facet changes superimposed on a congenitally narrow canal.

---

[3] The Patrick's Test is used to assess flexion, abduction, and external rotation of the hip. Pain on testing is a general indication that there is pathology in the hip joint or surrounding muscles. Brown DP, Freeman ED, Cuccurllo S., et al. *Lower Extremities – Hip*. Physical Medicine and Rehabilitation Board Review. (Cuccurullo S, ed. New York: Demos Medical Publishing, 2004).

This produces moderate to severe narrowing of the thecal sac.  Moderate bilateral neural foraminal narrowing is present.

3.  Milder degrees of disc and facet degenerative change at L2-3 and L3-4 without distinct disc herniation.  There is question of an annular tear in the far left lateral region of the L2-3 disc.  Mild canal narrowing, partly on a congenital basis, is present at these levels.

(AR 500.)

On April 14, 2011, Plaintiff was again examined by Dr. Lo.  (AR 506-08.)  Dr. Lo noted the MRI findings.  On examination, Dr. Lo noted a positive Patrick's test bilaterally, a positive Faber's test bilaterally, but a negative straight leg raising test.  (AR 507.)  Dr. Lo noted Dr. Warbritton's findings, as well as the results of the psychiatric AME.  (AR 507.)  Given the radiculopathy in Plaintiff's lower back, Dr. Lo requested authorization for a transforaminal epidural steroid injection ("TFESI").  (AR 507.)  He also recommended a bilateral sacroiliac joint injection if Plaintiff experienced persistent back pain after the TFESI.  (AR 507.)

On April 25, 2011, Dr. Lo completed a letter detailing Plaintiff's injuries and his opinion as to Plaintiff's residual functional abilities and listing Mr. Vargas' injuries are as follows:

1.  Degenerative Disc Disease of the lumbar spine aggravated by industrial injuries[;]
2.  Left L5 and S1 radiculopathy confirmed by EMB/NCS due to industrial injuries[;]
3.  Left shoulder injury[;]
4.  Right ankle injury/sprain (8/10/06)[;]
5.  Left knee straining (2/20/03, 12/20/07)[;]
6.  Left ACL tear and medial and lateral meniscus tear (12/20/07) s/p left ACL repair and partial meniscectomies on 5/9/08[;]
7.  Disruption of right ulnar collateral ligament s/p surgical repair 7/5/05[;]

It is my opinion that Mr. Vargas can do no more than sedentary work with the following restrictions:

1.  No lifting [greater] than 5 lbs once, and not repeated lifting[;]
2.  No bending, stooping, kneeling, crawling, twisting[,] or reaching[;]
3.  No stair/ladder climbing[;]
4.  No pushing/pulling objects on wheels [greater] than 10 lbs[;]
5.  [Plaintiff] should not sit for prolonged periods ([greater than] 1 hour) without a 5 minute break to walk and stretch, or lie down if necessary.  Every 3 hours, [Plaintiff] should have at least 15 minutes to lie down, stretch, change positions, or walk around[;]
6.  [Plaintiff] should not work more than 4 hours/day and 3 days/week, at first, and gradually increase time/days at work if tolerated.

8

1 (AR 505.)  Dr. Lo indicated that Plaintiff's injuries were of "moderate severity."  (AR 505.)

2 **2.      Medical Evidence Submitted to the Appeals Council**[4]

3 On May 5, 2011, Plaintiff's left knee was examined by Daniel F. Haber, M.D., an orthopedic

4 surgeon. (AR 514-15.) Plaintiff complained of instability and giving-way symptoms in his left knee.

5 (AR 514.)  Following an MRI of Plaintiff's left knee, Dr. Haber noted that it showed degenerative

6 changes, especially lateral with spurring in the femur and the tibia. (AR 514.)  Dr. Haber indicated

7 that he did not recommend aggressive treatment; an ACL reconstruction would be "overkill" given

8 Plaintiff's sedentary lifestyle.  (AR 515.)  Dr. Haber recommended that Plaintiff be fitted with a

9 custom ACL sport brace which would help stabilize his knee and prevent the giving-way symptoms.

10 (AR 515.)

11 On September 21, 2011, Dr. Lo completed a questionnaire regarding Plaintiff's residual

12 functional capacity. (AR 521-24.) Dr. Lo reported that Plaintiff had left shoulder, leg, and knee

13 pain. (AR 521.) Dr. Lo indicated that Plaintiff had depression and anxiety that affected his physical

14 condition, and that Plaintiff was "incapable of even 'low stress' jobs." (AR 521.) Dr. Lo opined that

15 Plaintiff could walk one city block without rest or severe pain; sit 15 minutes at one time without

16 needing to get up; stand 10 minutes in one place without needing to sit down or walk around; stand

17 less than two hours in an eight-hour day; and sit approximately four hours in an eight-hour day.

18 (AR 522.)  During the course of an eight-hour day, after every 15 minutes Plaintiff would need to

19 walk for approximately 5 minutes. (AR 522.) Plaintiff would require unscheduled 10-minute breaks

20 every 30 minutes during a regular work day. (AR 522.)  If Plaintiff engaged in prolonged sitting, he

21 should elevate his legs.  (AR 522.)

22 Dr. Lo indicated that Plaintiff would require a cane or other assistive device when performing

23 occasional standing or walking.  (AR 522.)  Dr. Lo limited Plaintiff to lifting less than 10 pounds

24 only occasionally, rarely lifting more than 10 or 20 pounds, and never lifting more than 50 pounds.

25 (AR 522.) Further, Plaintiff could only occasionally look down, turn his head right or left, look up,

26 or hold his head in a static position.  Plaintiff was never to twist, stoop, bend, crouch, squat, climb

27

28 [4] The following evidence was presented for the first time to the Appeals Council following the Administrative Law Judge's ("ALJ") decision, and it was made part of the Administrative Record.

ladders or stairs, or perform any overhead reaching. (AR 523.) Finally, Dr. Lo opined that Plaintiff would likely be absent from work more than four days per month due psychological limitations. (AR 523.)

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an ALJ. (AR 59-75; 87-88.) On April 28, 2011, the ALJ held a hearing where Plaintiff, through the assistance of counsel, and a Vocational Expert ("VE") testified. (AR 39-58.)

**1.    Hearing Testimony**

Plaintiff testified that he has been a driver for approximately 32 years, and he was employed with DHL for the last 17 or 18 years as a delivery driver for overnight express packages. (AR 45.) He left DHL on December 20, 2007, after falling from a loading dock, and hurting his left knee and lower back. (AR 45.)[5] Following the injury, Plaintiff was unable to walk; if he lifted anything heavy, he would experience severe sciatica and numbness in both legs. (AR 46.)

Despite undergoing surgery on his knee, Plaintiff still experiences difficulty doing anything repetitive, and he is limited in the things that he can grab or grasp. (AR 46-47.) He limits himself to lifting objects less than five pounds because lifting irritates his lower back. (AR 47.) Plaintiff experiences pain on bending, and he has difficulty sitting because he constantly needs to move to a different position to relieve the pressure that he experiences in his lower back. (AR 47-48.) He has difficulty with his left shoulder and cannot extend his left arm without extreme pain. He experiences panic attacks and dizziness as a result of "dealing with [his] injury." (AR 49.) He has taken anti-depressants in the past, but is not currently taking them because of side effects including "seeing different colors." (AR 50.) He has received psychiatric treatment, but he stopped because the treatment made him feel worse. (AR 51.)

On an average day, Plaintiff stays home and watches television in a seated position from which he moves quite frequently. (AR 51.) He can stand for less than 15 minutes at one time, and

---

[5] After leaving his job, Plaintiff reported that he received state disability benefits and workers compensation benefits. (AR 44.) Plaintiff also received a severance from DHL. (AR 44.)

is able to be on his feet for approximately two hours in an eight-hour day.  He can walk approximately a block, and he can sit for approximately an hour in an eight-hour day.  (AR 53.)  His treating physician, Dr. Lo, has recommended lidocaine patches and another topical pain killer as well as injections to his back.  (AR 50.)

A VE also testified at the hearing, and indicated that Plaintiff's job at DHL was considered medium and semi-skilled.[6]  The ALJ posed several hypothetical questions to the VE.  In the first hypothetical posed by the ALJ, the VE considered a person of the same age and with the same educational and work history as Plaintiff who retains the capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit six hours in an eight-hour day; but can only occasionally climb ramps and stairs, balance, kneel, stoop, crouch, and crawl.  The hypothetical individual is precluded from climbing ropes, ladders, or scaffolds, and has moderate difficulty in performing complex or detailed tasks, but retains the ability to relate to and interact with others, adapt to usual changes in work settings, and can adhere to safety rules.  (AR 55.)  In posing this hypothetical, the ALJ defined "moderate difficulty" as being impacted at least a third of the time. (AR 56.)  The VE testified that such a hypothetical individual could not perform Plaintiff's past relevant work as a DHL driver, but could perform other work including that of a fast food worker, a cashier, and cafeteria attendant.  (AR 56.)

The VE considered a second hypothetical person of the same age, education, and work history as Plaintiff who retained the capacity to lift and carry five pounds; stand two hours total; walk one block maximum; sit for one hour total with the option to sit and stand as needed; but would have difficulty bending, stooping, kneeling, crouching, crawling, and twisting; could not reach overhead with the left, non-dominant, upper extremity; and would have difficulty in or around unfamiliar places or settings.  (AR 57.)  The VE testified that such a person could not perform Plaintiff's past relevant work or any other work in the national economy.  (AR 57.)

### 2.    The ALJ's Decision

---

[6] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, [the Commissioner determines] that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567(c), 416.967(c).

On May 10, 2011, the ALJ issued a decision, finding Plaintiff not disabled.  (AR 25-34.) Specifically, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since the alleged onset date of disability; (2) has the following severe impairment or a combination of impairments:  major depressive disorder, status-post left knee derangement, diabetes mellitus, and obesity; (3) does not have an impairment or combination of impairments that meets or equals one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is unable to perform his past relevant work; and (5) could perform other jobs in significant numbers in the national economy.  (AR 25-34.)

The ALJ determined that Plaintiff has the residual functional capacity ("RFC")[7] to perform light work,[8] occasionally climb ramps and stairs, balance, kneel, stoop, crouch, and crawl; but cannot climb ropes, ladders, or scaffolds.  He would have moderate difficulty in performing complex and detailed tasks, but he is able to relate and interact with others, adapt to usual changes in work settings, and adhere to safety rules.  (AR 29.)

Plaintiff sought review of this decision before the Appeals Council.  (AR 14-17.)  On March 13, 2012, the Appeals Council denied review.  (AR 1-6.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.981.

## C.    Plaintiff's Complaint

---

[7] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

[8] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities.  If someone can do light work, [the Commissioner determines] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

On May 17, 2012, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. Plaintiff asserts that the ALJ failed to discuss significant and probative evidence, new medical evidence submitted to the Appeals Council renders the ALJ's decision unsupported by substantial evidence requiring remand, and the ALJ improperly considered Plaintiff's lay testimony.

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

1  such severity that the claimant is not only unable to do her previous work, but cannot, considering

2  her age, education, and work experience, engage in any other kind of substantial, gainful work that

3  exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

4          The regulations provide that the ALJ must undertake a specific five-step sequential analysis

5  in the process of evaluating a disability.  In the First Step, the ALJ must determine whether the

6  claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).

7  If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment

8  or a combination of impairments significantly limiting her from performing basic work activities.

9  *Id.* §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the

10  claimant has a severe impairment or combination of impairments that meets or equals the

11  requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.  *Id.*

12  §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant

13  has sufficient residual functional capacity despite the impairment or various limitations to perform

14  her past work.  *Id.* §§ 404.1520(f), 416.920(f).  If not, in the Fifth Step, the burden shifts to the

15  Commissioner to show that the claimant can perform other work that exists in significant numbers

16  in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or

17  not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v.*

18  *Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

19                                          **DISCUSSION**

20  **A.    The ALJ Did Not Fail to Consider Relevant Medical Evidence**

21          Plaintiff argues that the ALJ failed to consider the April 6, 2011, MRI of Plaintiff's lumbar

22  spine ordered by Dr. Lo which showed several significant abnormalities.  Plaintiff also alleges that

23  the ALJ failed to mention "critical EMG evidence about radiculopathy" in Plaintiff's lower back.

24  (Doc. 17, 8:5-9:2.)  According to Plaintiff, these records establish that he has a severe lower-back

25  impairment.

26          The Commissioner asserts that the ALJ did not overlook this evidence.  Specifically, the ALJ

27  stated that he considered the records arising from Plaintiff's visits with Dr. Lo in determining

28  Plaintiff's RFC, and the EMG and MRI findings were contained in those records.  The ALJ also

14

1  referenced Plaintiff's May 2009 AME, his July 2009 consultative examination, and his treatment

2  which illustrates that the ALJ considered Plaintiff's back-related allegations and the related clinical

3  findings.  Moreover, the EMG study and the MRI results are insufficient evidence to establish a

4  disabling lower-back condition and the findings on these tests were consistent with the RFC.

5       The ALJ is not required to discuss every piece of medical evidence contained in the record.

6  *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003).  Here, Drs. Lo and

7  Warbritton discussed the objective test results, which included the MRI and EMG results, in

8  reaching their opinions.   In turn, the ALJ considered Drs. Lo and Warbritton's opinions,

9  examinations, and clinical findings.  Plaintiff's contention that the ALJ overlooked the EMG and

10  MRI findings because they were not expressly discussed by the ALJ is therefore without merit.

11       Plaintiff asserts that the ALJ's failure to expressly discuss the EMG and MRI findings

12  indicates that the ALJ erred by failing to find that Plaintiff's lower-back condition was severe at the

13  Second Step of the sequential analysis.  However, any error in this regard is harmless because the

14  ALJ resolved the Second Step in Plaintiff's favor, continued the sequential analysis, and considered

15  Plaintiff's lower-back symptomatology at the Fourth Step.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th

16  Cir. 2007).  Due in part to Plaintiff's reported lower-back pain, Dr. Georgis opined that Plaintiff

17  would be restricted to occasional climbing, balancing, stooping, kneeling, crouching, and crawling

18  and that Plaintiff was limited to carrying 20 pounds occasionally, and 10 pounds frequently.  These

19  limitations were adopted by the ALJ in formulating the RFC.  (AR 29.)

20       The ALJ also considered Dr. Warbritton's examination records and ascribed his opinion

21  some weight.  Dr. Warbritton assessed both Plaintiff's lower-back symptoms as well as his left knee

22  impairment.  Dr. Warbritton noted that Plaintiff exhibited a positive straight leg raising test on the

23  left at 60 degrees and slight tenderness about the lumbosacral junction; he also reported that the

24  abnormal EMG studies evidenced chronic left L5 and S1 radiculopathies with mild ongoing

25  denervation. (AR 465-66.)  Despite this, Dr. Warbritton ascribed an impairment rating of Plaintiff's

26  lumbar spine in the maximal range of thirteen percent impairment of the whole person, which the

27  ALJ noted and found to be low and not indicative of a disabled person.  (AR 31.)  The ALJ also

28  considered Dr. Lo's treating records, which included examination findings and opinions regarding

Plaintiff's lower-back symptomatology.  Therefore, the record reflects that the ALJ considered Plaintiff's lower-back symptomatology and incorporated limitations addressing these symptoms into the RFC.

Finally, as the Commissioner notes, the EMG and MRI results themselves do not establish that Plaintiff's lower-back condition is disabling or impacts his RFC beyond that which the ALJ assessed.  The April 2009 EMG indicated left L5 and S1 radiculopathy, but Dr. Warbritton considered these results and still concluded that Plaintiff's lower-back impairment was only a thirteen percent impairment of the whole person, which the ALJ found to be in the low range and not indicative of a disabled person.  Shortly after Plaintiff underwent the EMG testing, on examination with Dr. Georgis, Plaintiff was noted to have a normal gait pattern, a Romberg test was negative, and he was able to heel walk, toe walk, although evidenced slight difficulty with tandem walking.  (AR 342.)  Plaintiff's straight leg raising test was negative in both the sitting and supine position.  (AR 342.)  Dr. Georgis also noted that Plaintiff's back was straight with no deformity, instability, or spasm, but Plaintiff had mild tenderness.  (AR 343.)  Similarly, the April 2011 MRI results showed mostly mild findings and subsequent examination by Dr. Lo indicated a negative straight-leg raise test, intact reflex functioning, and normal motor strength aside from a slight diminution of strength in his lower left extremity.  (AR 503.)  At examination in April 2011, Dr. Lo noted that Plaintiff had normal sensory functioning, intact reflex functioning, full range of motion in his lumbar spine, and negative straight leg raising tests.  (AR 506.)  Plaintiff points to nothing in the EMG or MRI results that the physicians failed to consider that would alter the ALJ's consideration of those physician's findings and opinions and, in turn, the RFC.

**B.     The New Evidence Submitted to the Appeals Council Does Not Render the ALJ's Decision Unsupported by Substantial Evidence**

Plaintiff argues that new evidence submitted to the Appeals Council renders the ALJ's findings and decision unsupported by substantial evidence.  Specifically, Plaintiff argues that a May 5, 2011, opinion from Dr. Haber and a September 22, 2011, questionnaire completed by Dr. Lo undercut the ALJ's decision.

1    Pursuant to 20 C.F.R. § 404.970(b), evidence submitted for the first time to the Appeals

2    Council must be considered as follows:

3        [I]f new and material evidence is submitted, the Appeals Council shall consider the
         additional evidence only where it relates to the period on or before the date the
4        administrative law judge hearing decision . . . It will then review the case if it finds
         that the administrative law judge's actions, findings, or conclusion is contrary to the
5        weight of the evidence currently of record.

6    The Ninth Circuit has held that where a claimant submits evidence for the first time to the

7    Appeals Council, which is in turn considered by the Appeals Council in denying review of the ALJ's

8    decision, the new evidence must be treated as part of the administrative record. *Brewes v. Comm'r*

9    *of Soc. Sec. Admin.*, 682 F.3d 1157, 1161-62 (9th Cir. 2012).  As such, the district court is obligated

10   to consider that evidence in determining whether the ALJ's decision is supported by substantial

11   evidence.  *Id.*  The *Brewes* court clarified that claimants are not required to show "good cause"

12   before submitting new evidence to the Appeals Council.  *Id.* at 1162.  Nor is a claimant required to

13   establish that the new evidence is material to trigger the district court's obligation to consider it

14   where it has already become part of the record by virtue of the Appeals Council's review of the

15   evidence.  *Id.* at 1164.  Rather, when the Appeals Council accepts a claimant's proffer of new

16   evidence and makes it part of the record, it is essentially concluding that the evidence is material

17   within the meaning of 20 C.F.R. § 404.970(b).  *Id.*  Thus, in reviewing new evidence submitted for

18   the first time to the Appeals Council, courts are required to determine "whether, in light of the record

19   as a whole, the ALJ's decision was supported by substantial evidence." *Id.* at 1163.

20       Dr. Haber examined Plaintiff on April 22, 2011, for an initial orthopedic consultation of

21   Plaintiff's left knee. (AR 516-19.)  On examination, Dr. Haber found that there was a "considerable

22   amount of increased laxity to anterior drawer and Lachman's on the left versus the right knee."

23   (AR 518.)  Dr. Haber noted this could be caused by one of two things: (1) the left knee graft was

24   simply stretched or was looser than the intact side; or (2) there was a recurrent tear of the ACL.

25   (AR 518.)  Dr. Haber hypothesized it was the latter, and recommended an MRI to confirm his

26   opinion. (AR 518.)  On April 29, 2011, Plaintiff underwent an MRI.  (AR 615.)  The radiologist

27   provided the following findings:

28       1.    The ACL graft is torn.

2.      Posterior horn of lateral meniscus is absent.   There is chondromalacia posterior aspect of the lateral compartment.

3.      The posterior horn of medial meniscus is small and truncated. Correlate with history.  Focal signal in the body of the medial meniscus abuts the inferior articular surface seen only on the coronal view.  Equivocal for a tear.

4.      Focal chondromalacia in the patellar cartilage near the apex.

(AR 615.)  On May 5, 2011, Plaintiff was again examined by Dr. Haber who reviewed the MRI findings and reported that he would "not recommend aggressive treatment for [Plaintiff's knee] problem.  Given the patient's rather sedentary lifestyle, in my opinion, ACL reconstruction would be overkill." (AR 515.) Dr. Haber instead recommended an ACL sport brace, which would help stabilize Plaintiff's knee and prevent the "giving-way" symptoms that he experiences.  (AR 515.)

The Commissioner argues that neither the MRI results nor Dr. Haber's examination findings represent any noteworthy changes from the medical evidence considered by the ALJ.  For example, Plaintiff's range of motion in his left knee during his May 2011 examination with Dr. Haber showed a range of motion from 0 to 125 degrees (AR 517), which was comparable to what was observed at Plaintiff's July 2009 consultative physical examination (AR 342).  While the MRI findings showed evidence of a tear in the ACL graft and degenerative changes, there was no evidence of joint effusion, meniscal damage, or damage to the collateral ligaments.  Moreover, as the Commissioner notes, Dr. Haber did not recommend surgery, but recommended only a knee brace to address the instability that Plaintiff was experiencing in his knee.

Finally, Dr. Haber's findings also mirror those made by Dr. Warbritton in May 2009. (AR 472.) Dr. Warbritton noted that Plaintiff exhibited "significant residual laxity" in his left knee; rather than attempting further reconstructive surgery, Dr. Warbritton recommended that Plaintiff be provided with a custom-made derotation brace.  (AR 472.)  In light of the fact that Dr. Warbritton had noted the instability and laxity problems Plaintiff was experiencing in his left knee and made the same recommendation for treatment as Dr. Haber – a custom knee brace to address left-knee instability – the April 2011 MRI and Dr. Haber's examination findings do not render the ALJ's decision unsupported by substantial evidence.

1    With respect to Dr. Lo's September 2011 opinion, the Commissioner contends that it does

2  not undercut the ALJ's RFC, and the ALJ's decision remains supported by substantial evidence.  The

3  Court agrees.  First, Dr. Lo's September 2011 opinion about Plaintiff's limitations is not markedly

4  different from his April 2011 opinion. (*Compare* AR 521-24 *with* AR 505.)  For example, in April

5  2011, Dr. Lo opined that Plaintiff should perform no lifting greater than 5 pounds, and should

6  perform no bending, stooping, kneeling, crawling, twisting or reaching, and no stair or ladder

7  climbing. (AR 505.)  Dr. Lo also opined that Plaintiff should not sit for prolonged periods without

8  a 5 minute break to walk and stretch or lie down if necessary; Plaintiff was also to take a 15 minute

9  break every three hours to lie down, stretch, change positions, or walk around.  (AR 505.)  In

10  September 2011, Dr. Lo opined that Plaintiff could occasionally lift and carry less than 10 pounds,

11  could rarely lift and carry 10 to 20 pounds, and could never lift 50 pounds. (AR 522.)  He also

12  opined that Plaintiff would need to take unscheduled breaks every 30 minutes, and that he should

13  elevate his legs after prolonged sitting. (AR 522.)  Similar to his April 2011 opinion, Dr. Lo again

14  opined that Plaintiff was never to twist stoop, crouch, squat, or climb ladders or stairs.  (AR 523.)

15    Second, to the extent Dr. Lo's September 2011 report indicates increased limitations, the

16  September 2011 report is not supported by any additional treatment or clinical findings, but appears

17  based on the treatment rendered in April 2011.  Dr. Lo points to no additional clinical findings to

18  support his September 2011 opinion, and no further treatment records after April 2011 were

19  submitted by Plaintiff.  While Plaintiff asserts that one basis for the ALJ's rejection of Dr. Lo's April

20  2011 opinion was the short duration of the treating relationship with Plaintiff, and argues that the

21  September 2011 opinion undercuts the ALJ's rationale in this regard, the subsequent September 2011

22  opinion does not evidence further *treatment* by Dr. Lo; it is instead an opinion based on previous

23  treatment already considered by the ALJ.  The September 2011 questionnaire itself provides no basis

24  for the ALJ to reconsider the length or duration of the treating relationship between Plaintiff and Dr.

25  Lo.

26    Finally, as the Commissioner notes, the questionnaire completed by Dr. Lo in September

27  2011 is internally inconsistent with his previous examination findings and inconsistent with other

28  medical evidence in the record.  Dr. Lo opined that Plaintiff could only occasionally perform

activities that required the movement of his neck, but on examination in March 2011 Dr. Lo indicated that Plaintiff had a full and painless range of motion in his neck with no evidence of radiculopathy. (*Compare* AR 523 (indicating Plaintiff could only occasionally maintain sustained flexion of his neck, turn his head right or left, look up, or hold his head in a static position) *with* AR 503 ("Exam of his neck shows full range of motion with negative Spurling's test.").) As noted, there are no new clinical findings cited to support the portion of the September 2011 opinion related to Plaintiff's limited neck functioning. Further, the September 2011 opinion indicated that Plaintiff's anxiety and depression affected his physical condition and restricted his ability to tolerate work stress. (AR 521). However, at Dr. Lo's last examination of Plaintiff in April 2011, Plaintiff denied any symptoms of anxiety, depression, or nervousness. (*Compare* AR 521 *with* AR 507.) Again, there are no new clinical findings to support this portion of the September 2011 opinion.

In contrast with other evidence, while Dr. Lo found Plaintiff only able to sit for 15 minutes at a time (AR 521), the record reflects that Plaintiff was repeatedly able to sit comfortably for extended periods of time. For example, at his May 2009 AME, Plaintiff was "observed to sit comfortably throughout the one hour interview and examination period." (AR 464.) Similarly, during a July 2009 consultative examination, Plaintiff was noted to sit comfortably during the examination. (AR 341.)

Dr. Lo's September 2011 opinion is notably similar to his April 2011 opinion, which the ALJ considered. Moreover, the September 2011 opinion is not supported by additional treatment records or clinical findings, and the opinion itself is inconsistent with Dr. Lo's March and April examinations of Plaintiff as well as other evidence in the record. Thus, when viewing the record as a whole, the September 2011 opinion does not render the ALJ's decision unsupported by substantial evidence.

**C.    The ALJ Stated Clear and Convincing Reasons to Discredit Plaintiff's Lay Testimony**

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that her impairment "could reasonably be expected to cause the

severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection.  *Id.*  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929.  Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The ALJ made the following findings with respect to Plaintiff's credibility:

> A careful review of the record does not support the severity of the claimant's alleged limitations.  Despite claims of debilitating impairments, objective findings indicate the claimant's impairments are mild, with his left knee and left shoulder stable, and his diabetes mellitus controlled on medication.  He tends to exaggerate his limitations, both physical and psychological.  In May 2010, psychologist Tara May reported the claimant's propensity towards somatization (Exhibit 15F/22).  Further reflecting negatively on the claimant's credibility, he testified he last worked in December 2007; however, he apparently worked, with reported earnings just slightly under the level of substantial and gainful activity in 2008 and 2009 (Exhibit 6D, page 3).

(AR 32.)

Plaintiff asserts that the ALJ erred in considering Dr. May 's statement that Plaintiff tended toward somatization as a basis to find him less credible.  Plaintiff asserts that somatization is not simply exaggeration, but a somatic disorder that involves exaggerated perception of symptoms, not exaggerated reporting.  Thus, "[i]f somatization were present, any reporting that seemed exaggerated would be part of a perception disorder, and not dishonest."  (Doc. 17, 13:4-5.)

1    The Commissioner contends that Plaintiff "confuses Dr. May's finding with a diagnosis of

2  a somatoform disorder."  The record, however, contains no diagnosis for a somatoform disorder, and

3  Dr. May's description that Plaintiff reflected a "propensity towards" rather than being a product of

4  somatozation indicates that "Dr. May was simply characterizing the manner of Plaintiff's reporting"

5  rather than finding Plaintiff exhibited an unspecified somatoform disorder.  (Doc. 19, .)

6    Dr. May's report that Plaintiff tended toward somatization supports the ALJ's finding that

7  Plaintiff's symptom reporting was exaggerated.  While this evidence may be subject to more than one

8  rational interpretation, it is the ALJ's interpretation of the evidence that must be upheld.  *Magallanes*

9  *v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  In conjunction with a finding that Plaintiff tended to

10  exaggerate his symptoms, the ALJ also noted that the objective medical evidence did not support the

11  degree of symptoms alleged. (AR 32 "Despite claims of debilitating impairments, objective findings

12  indicate that the claimant's impairments are mild").)   The ALJ observed that Plaintiff's left knee

13  condition and shoulder condition had been described as stable, Plaintiff's diabetes was controlled by

14  medication, and Plaintiff had reported to his physician that he had started a program of walking to

15  supplement his exercise on a stationary bicycle to lose weight.  (AR 30, 32.)  The Commissioner

16  contends that these medical findings and Plaintiff's capacity to engage in regular physical activity

17  of this kind reinforces the ALJ's conclusion that the medical evidence failed to support the degree

18  to which  Plaintiff  alleged  he  is  impaired.    These  factors  taken  together  support  the  ALJ's

19  determination, and the reasoning offered is legally sufficient.

20    Plaintiff contends that the ALJ failed to note the consistency of Plaintiff's reports of pain,

21  which is required by Social Security Ruling ("SSR") 96-7p.  Social Security Ruling 96-7p provides

22  that one "strong indication of the credibility of an individual's statements is their consistency, both

23  internally and with other information in the case record.  The adjudicator must consider such factors

24  as" (1) the degree to which the individual's statements are consistent with the medical signs and

25  laboratory findings and other information provided by medical sources, (2) the consistency of the

26  individual's own statements, and (3) the consistency of the individual's statements with other

27  information in the case record, including reports and observations by other persons concerning the

28  individual's daily activities, behavior, and efforts to work.  SSR 96-7p.

1    The ALJ is not required to discuss and explicitly analyze all of the consistency factors

2    enumerated in SSR 96-7p. Rather, the ALJ must give *consideration* to these factors. *See* SSR 96-7p

3    at *4. The record in this case reflects adequate consideration of the consistency factors outlined in

4    SSR 96-7p. In particular, the ALJ noted that Plaintiff reported to his physician that he was using a

5    stationary bike for exercise in June 2010 in an examination with Dr. Whyman (AR 480), which

6    reflects consideration of the consistency of Plaintiff's reports of pain and limitation in comparison

7    to what he reported to his physicians. SSR 96-7p, at *5 ("Especially important are statements made

8    to treating or examining medical sources" in evaluating the consistency of Plaintiff's statements).

9    The ALJ also compared Plaintiff's lay statements to other information in the case, particularly the

10   objective medical evidence (AR 30-32.) SSR 96-7p, at *5 (the degree to which an individual's

11   statements are consistent with the medical signs and laboratory findings and other information

12   provided by medical sources is an important factor to consider in evaluating credibility). While the

13   ALJ may not have expressly discussed the consistency of Plaintiff's lay statements to his hearing

14   testimony, the decision reflects adequate consideration of the consistency factors.

15   Plaintiff's argument that the ALJ did not perform the credibility analysis before the ALJ

16   determined the RFC lacks merit. Although the ALJ set out the RFC determination as a specific and

17   express finding, followed by a discussion of the evidence (including Plaintiff's lay statements and

18   credibility) that informed the RFC determination, this does not necessarily indicate that the RFC was

19   impermissibly assessed *before* the credibility of Plaintiff's lay testimony was considered. The fact

20   that the ALJ stated Plaintiff's subjective complaints "were not credible to the extent they are

21   inconsistent with the above residual functional capacity assessment" does not necessarily mean that

22   Plaintiff's statements were considered *after* the RFC was formulated. Rather, the Court views the

23   ALJ's statement in this regard as a way in which the ALJ could make clear what portions of

24   Plaintiff's lay testimony were rejected – i.e., anything that was not adopted in the RFC assessment

25   was rejected by the ALJ as not credible. The particular order of the ALJ's wording does not

26   constitute evidence of harmful error. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (the

27   ALJ need only articulate the evidence sufficiently to enable the court to trace his or her path of

28   reasoning); *Reddy v. Commodity Futures Trading Comm'n*, 191 F.3d 109, 125-26 (2d Cir. 1999) (a

1    reviewing court will not be "disposed to overturn a sound decision if the agency's path, although not

2    ideally clear, may reasonably be discerned." (citations omitted)).

3        Finally, the Commissioner concedes that the ALJ erred in finding that Plaintiff had

4    misrepresented his work history as a basis to reject Plaintiff's lay testimony. (Doc. 19, 21:13-22:2.)[5]

5    However, this error is harmless in light of the other legally sufficient reasons offered to reject

6    Plaintiff's credibility that were discussed above. *See Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d

7    1190, 1197 (9th Cir. 2004) (where ALJ provides a number of justifications for his decision, only one

8    of which constitutes error, court must determine whether remaining legitimate justifications provide

9    substantial evidence supporting the decision).

10                                    **CONCLUSION**

11       Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

12   evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court

13   DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.

14   The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin,

15   Acting Commissioner of Social Security, and against Plaintiff Robert Manuel Vargas.

16

17   IT IS SO ORDERED.

18   **Dated:    July 15, 2013                        /s/ Sheila K. Oberto**
                                        UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26       [5] The ALJ rejected Plaintiff's credibility in part because he testified that he last worked in December 2007, but
     his reported earnings were only slightly under the level of substantial and gainful activity in 2008 and 2009.  However,
27   Plaintiff testified at the hearing that his earnings in 2008 and 2009 came from disability payments, workers compensation
     payments, a severance payment from DHL, and retirement from Teamsters.  (AR 44.)  Thus, the ALJ's reasoning is not
28   supported by substantial evidence with regard to this credibility factor.